IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JACK JAY HESKETH,                                   Case No. 1:15-cv-02396-SB

                Plaintiff,                          **OPINION AND ORDER**

        v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

                Defendant.

_____

**BECKERMAN, Magistrate Judge.**

        Jack Hesketh ("Hesketh") brings this appeal challenging the Commissioner of Social

Security's ("Commissioner") denial of his application for Social Security disability insurance

benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-34. The Court has

jurisdiction to hear this appeal pursuant to 42 U.S.C. § 405(g). For the reasons explained below,

the Court affirms the Commissioner's decision because it is free of legal error and supported by

substantial evidence.

## BACKGROUND

Hesketh was born in October 1958, making him fifty-three years old on November 1, 2011, the alleged disability onset date. Hesketh has a twelfth-grade education, and his past relevant work includes time as a telecommunications technical account executive. He alleges disability due primarily to peripheral neuropathy.

On July 13, 2012, Hesketh visited the emergency department at Three Rivers Community Hospital, complaining of ringing in his left ear that had "progressively become worse" over the prior months. (Tr. 220.) Hesketh was treated for probable otitis externa and discharged from the hospital.[1]

On October 10, 2012, Hesketh underwent a consultative examination with Dr. Roger Steinbrenner ("Dr. Steinbrenner"). Dr. Steinbrenner's musculoskeletal examination revealed the following:

> Motor strength is normal, [five out of five strength], upper and lower extremities. He has an abnormal gait, which is somewhat waddling and with feet externally rotated, walking more on the balls of his feet than the heels. Deep tendon reflexes are [two plus] and equal, knees and ankles. Vibratory sensation is intact. He is unable to walk on his heels, is able to walk on his toes. Straight leg raising is positive at about [sixty] degrees because of tightness in the hamstrings, sitting and supine. He has a good grip. Fingering and handling are normal. Limited range of motion at right shoulder with abduction limited to [ninety] degrees.

(Tr. 269.) Based on his examination and discussion with Hesketh, Dr. Steinbrenner assessed peripheral neuropathy of an uncertain etiology and probable adhesive capsulitis in the right shoulder. He opined that Hesketh is unable to sit, stand, or walk for more than twenty to thirty minutes at a time due to pain in his legs and feet, or lift and carry more than twenty-five pounds

---

[1] Otitis externa, also known as "swimmer's ear," is characterized by "localized pain, swelling, and inflammation." *Diichi Pharm. Co. v. Apotex, Inc.*, 380 F. Supp. 2d 478, 482 n.4 (D.N.J. 2005).

due to adhesive capsulitis. Dr. Steinbrenner found no evidence of rheumatoid arthritis on physical examination.

On October 22, 2012, Dr. J. Scott Pritchard ("Dr. Pritchard"), a non-examining state agency physician, completed a physical residual functional capacity assessment. (Tr. 79-81.) Based on his review of the record, Dr. Pritchard determined that Hesketh could lift and carry twenty pounds occasionally and ten pounds frequently; sit, stand, or walk up to six hours in an eight-hour workday; push or pull in accordance with his lift and carry restrictions; occasionally climb ladders, ropes, or scaffolds; balance, stoop, kneel, crouch, crawl, and climb ramps and stairs without limitation; handle, finger, and feel without limitation; and occasionally reach in any direction. Dr. Pritchard also found no evidence of visual, communicative, or environmental limitations.

On January 16, 2013, Hesketh established care with Karen Hoskins ("Hoskins"), a nurse practitioner.[2] Hesketh complained of worsening peripheral neuropathy, rheumatoid arthritis, pain in his ankles, legs, and left knee, weakness in his legs, and a burning sensation in his heels and toes. Hoskins noted that Hesketh exhibited a "normal gait," and full range of motion and strength in his upper and lower extremities. (Tr. 279-80.) Hoskins prescribed Cymbalta to treat Hesketh's pain, and advised Hesketh to avoid refined foods and to engage in "[r]egular exercise most days for [thirty] minutes or more, including cardiovascular, strength and flexibility training." (Tr. 281.)

---

[2] "[A] nurse practitioner could be considered a medically acceptable source where he worked so closely under a physician that he was acting as the physician's agent." *Britton v. Colvin*, 787 F.3d 1011, 1013 (9th Cir. 2015) (citing *Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996)). However, nothing in the record indicates that Hoskins worked under or with any physician at Karen Hoskins PC.

On January 23, 2013, Dr. Lloyd Wiggins ("Dr. Wiggins"), a non-examining state agency physician, completed a physical residual functional capacity assessment, agreeing with Dr. Pritchard's findings. (Tr. 89-91.)

On January 30, 2013, Hesketh presented for a follow-up visit with Hoskins and complained of pain in his left hip and knee. Hesketh also reported that he uses a walker in the morning due to leg weakness, that his "mobility improves with moving around," that "he is able to get around using a cane," that "he stoves up if he is sedentary for more than [thirty] minutes," and that "he has dealt with this pain for a numbers of years." (Tr. 284.) Hoskins noted that a number of autoimmune/inflammatory studies were ordered based on Hesketh's prior reports of joint pains. Hoskins added that antinuclear antibody ("ANA"), cyclic citrullinate peptide ("CCP") antibody, and lyme disease tests were negative, and peripheral neuropathy-related testing (i.e., vitamin B12, folate, homocysteine, and ferritin) "[a]ll were at normal levels." (Tr. 284.)

On March 27, 2013, Hesketh presented for a consultation with his neurologist, Dr. Yung Kho ("Dr. Kho"), regarding his "bilateral lower extremities peripheral neuropathy." (Tr. 314.) Dr. Kho noted that Hesketh's diagnosis was "idiopathic neuropathy" that had not responded to Gabapentin, and that Hesketh's health had "gradually worsened" over time. (Tr. 314.) Dr. Kho also noted that Hesketh has suffered from "idiopathic neuropathy" since 1986, and had a work-up "already at that time." (Tr. 316.) Dr. Kho added that Hesketh exhibited a normal gait, was able to stand without difficulty, and exhibited "[five out of five] bilateral symmetric [strength] in all four extremities." (Tr. 315.)

Hesketh presented for follow-up visits with Hoskins in April 2013. Hoskins' notes indicate that Hesketh exhibited "positive symptoms" of posttraumatic stress disorder ("PTSD")

and "moderately severe depression." (Tr. 289-90.) Hoskins' notes also indicate that Hesketh continued to complain of chronic pain in his "lower extremities, left knee," which Hesketh reported was "made better by elevating feet" and "made worse by standing or sitting too long." (Tr. 296.) Hesketh rated the "severity of interference [with] his general activity" caused by pain as a three on a ten-point scale. (Tr. 296.) Hoskins advised Hesketh to continue exercising and eating healthier.

In a treatment note dated July 17, 2013, Hoskins noted that Hesketh recently left "his bag of pills on [her] door step with a note saying '[W]on't need these. [D]on't want to live. [T]hanks for trying.'" (Tr. 301.) Hoskins noted that 911 was called and Hesketh denied being suicidal. He later informed Hoskins that he recently "ended up in jail" after his ex-wife took his dog and turned him in for an outstanding warrant. (Tr. 301.) Hesketh was taken off his medications, agreed to return to counseling, and reported that he was applying for a medical marijuana card because he felt that it was "amazing" and would help treat his peripheral neuropathy and PTSD. (Tr. 301.)

On September 19, 2013, Hesketh was seen by Michael Swartz ("Swartz"), a physician's assistant at Paragon Orthopedic Center, based on complaints of left knee pain. Hesketh informed Swartz that his symptoms began four years ago, that he had fallen off a ladder in 2007, and that he "worked as a logger and pole climber" for years, but was "now limited to wedding musician work." (Tr. 28, 344.) A magnetic resonance imaging ("MRI") scan revealed "a partial radial tear of the posterior horn of the medial meniscus, with a few posterior fibers remaining intact." (Tr. 343.)

On October 29, 2013, Hesketh presented for an orthopedic consultation with Dr. Robert Bents ("Dr. Bents"). Dr. Bents discussed the "findings of meniscal tear" with Hesketh and

"nonoperative versus operative options," and mentioned that "there may be findings of chondromalacia or early arthritis noted by arthroscopy which may comprise pain relief." (Tr. 337.) Hesketh consented to surgery after being advised of the risk of limited to incomplete pain relief.

On December 11, 2013, Hesketh underwent arthroscopic knee surgery with medial meniscectomy. On December 24, 2013, Hesketh presented for a post-operative visit with Swartz. Hesketh reported that his "satisfaction with surgery is very good," he was "improving," and his pain was "occasional." (Tr. 321.)

In a medical source statement dated January 21, 2014, Dr. Kho addressed Hesketh's diagnoses and estimated limitations. (Tr. 310-13.) Dr. Kho stated that Hesketh suffers from peripheral neuropathy and rheumatoid arthritis, which results in severe leg and foot pain, weakness, sensory loss, decreased deep tendon reflexes, chronic fatigue, and cramping and burning in the calves and feet. Dr. Kho estimated that Hesketh (1) can sit for thirty minutes at a time, (2) can stand for five minutes at a time, (3) can stand and walk for less than two hours in an eight-hour workday, (4) can sit for about two hours in an eight-hour workday, (5) needs a job that permits shifting positions, walking for five minutes every thirty minutes, taking fifteen-minute unscheduled breaks every thirty minutes, (6) needs to elevate his feet for up to six hours during a sedentary work day, (7) needs to use an assistive device when standing or walking, (8) can never lift twenty or more pounds, rarely stoop, crouch, or squat, and occasionally twist, and (9) would be absent from work more than four days per month as a result of his impairments or treatment needs.

Hesketh visited with Dr. Bents on January 27, 2014. Dr. Bents noted that Hesketh had not been attending physical therapy or doing his home exercise program "other than walking his

dog." (Tr. 318.) Hesketh reported that he had lost weight, was "wearing a knee brace when walking long distances," and was "able to walk up to a mile at this point which he could not do pre-operatively." (Tr. 318.) Dr. Bents noted that Hesketh was advised to "continue a home exercise program" and understood that his symptoms may "continue to improve with time." (Tr. 320.)

An administrative law judge ("ALJ") convened a video hearing on February 13, 2014, at which Hesketh testified about the limitations resulting from his impairments. (Tr. 26-71.) Hesketh testified that he stopped working in 2009 and exhausted his unemployment benefits in November 2011. Hesketh further testified that he spent the majority of the last fifteen years working as a sales representative in the telecommunications industry, and that he was "let go" because he had trouble meeting his job-related quotas and showing up for scheduled appointments on time. (Tr. 51.) Hesketh stated that his performance deteriorated because he suffers from peripheral neuropathy and had to interrupt his travel to reduce swelling and regain feeling in his legs. (Tr. 51.) Hesketh also testified that he had his left meniscus surgically repaired in December 2013, uses a walker in the morning due to leg weakness, has to elevate his feet eighty percent of the day in order to reduce swelling and pain in his legs, lives in an apartment with his eighty-five-year-old mother who assists with his basic care, and watches fourteen hours of television per day.

The ALJ also received testimony from Dr. Irvin Belzer ("Dr. Belzer"), a medical expert who testified at Hesketh's administrative hearing. Dr. Belzer testified that, based on his review of the medical records, Hesketh's peripheral neuropathy "hasn't [a]ffected [his] ability to stand and walk to any significant extent," citing physical examination findings that undermined opinions and testimony to the contrary. (Tr. 34.) Dr. Belzer also testified that Hesketh lacked the

serology and physical examination findings to support a diagnosis of rheumatoid arthritis, and that Hesketh did not have an impairment or combination of impairments that met or equaled one of the Listed Impairments. In terms of Hesketh's residual functional capacity, Dr. Belzer testified that he agreed with Drs. Pritchard and Wiggins' assessment that Hesketh could perform a modified version of light work. However, Dr. Belzer added that he would further restrict Hesketh to (1) no climbing of ladders, ropes, or scaffolds, and (2) no pushing or pulling of bilateral foot controls.

In a written decision issued on May 28, 2014, the ALJ applied the five-step process set forth in 20 C.F.R. § 404.1520(a)(4), and found that Hesketh was not disabled. *See infra*. The Social Security Administration Appeals Council denied Hesketh's petition for review, making the ALJ's decision the Commissioner's final decision. Hesketh timely appealed to federal district court.

## THE FIVE-STEP SEQUENTIAL ANALYSIS

## I.    LEGAL STANDARD

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are as follows:

> (1) Is the claimant presently working in a substantially gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal [one of the listed impairments]? (4) Is the claimant able to perform any work that he or she has done in

the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Id.* at 724-25. The claimant bears the burden of proof for the first four steps in the process. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of the first four steps, the claimant is not disabled. *Id*.; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

## II.     THE ALJ'S DECISION

The ALJ first determined that Hesketh had not engaged in substantial gainful activity since November 1, 2011, the alleged disability onset date. At the second step, the ALJ concluded that Hesketh had the severe impairments of peripheral neuropathy, shoulder joint dysfunction, cervical degenerative disc disease, and a history of meniscus tears "status post arthroscopy." (Tr. 12.) At the third step, the ALJ found that Hesketh did not have an impairment or combination of impairments that met or equaled one of the Listed Impairments. The ALJ then assessed Hesketh's residual functional capacity ("RFC") and found that he could perform light work that does not involve (1) climbing ropes, ladders, or scaffolds, or (2) pushing or pulling of bilateral foot controls. At the fourth step, the ALJ found that Hesketh is capable of performing his past work as a telecommunications technical account executive. Accordingly, the ALJ concluded that Hesketh was not disabled.

## STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* If the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the judgment of the ALJ. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## DISCUSSION

In this appeal, Hesketh argues that the ALJ erred by: (1) failing to provide clear and convincing reasons for discounting his subjective symptom testimony; (2) failing to offer legally sufficient reasons for rejecting the limitations assessed by Drs. Pritchard, Wiggins, Steinbrenner, and Kho; (3) failing to fully and fairly develop the record regarding Hesketh's mental impairments; and (4) concluding, at step four of the sequential process, that Hesketh could perform his past work as a telecommunications technical account executive. As explained below, the Court concludes that the Commissioner's decision is free of legal error and supported by

substantial evidence in the record. Accordingly, the Court affirms the Commissioner's denial of benefits.

## I.    CREDIBILITY DETERMINATION

### A.    Applicable Law

Absent an express finding of malingering, an ALJ must provide clear and convincing reasons for rejecting a claimant's testimony:

> Without affirmative evidence showing that the claimant is malingering, the [ALJ]'s reasons for rejecting the claimant's testimony must be clear and convincing. If an ALJ finds that a claimant's testimony relating to the intensity of his pain and other limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive. The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's [subjective] complaints.

*Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 597 (9th Cir. 1999) (citations omitted). Clear and convincing reasons for rejecting a claimant's subjective symptom testimony "include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her testimony and her conduct, daily activities inconsistent with the alleged symptoms, and testimony from physicians and third parties about the nature, severity and effect of the symptoms complained of." *Bowers v. Astrue*, No. 6:11-cv-583-SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) ("[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989))).

///

///

**B.     Application of Law to Fact**

There is no affirmative evidence that Hesketh is malingering and, therefore, the ALJ was required to provide clear and convincing reasons for discrediting Hesketh's symptom testimony. Upon review, the Court concludes that the ALJ satisfied the clear and convincing reasons standard.

First, the ALJ discounted Hesketh's testimony based on evidence of conservative treatment. For example, the ALJ noted that Hesketh uses only over-the-counter medications to treat his severe pain. (Tr. 18.) The Ninth Circuit has "previously indicated that evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment." *Bartlett v. Colvin*, No. 1:14-cv-00142-SB, 2015 WL 2412457, at *12 (D. Or. May 21, 2015) (quoting *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007))); *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (noting that subjective complaints can be rejected where the claimant's "claim that she experienced pain approaching the highest level imaginable was inconsistent with the 'minimal, conservative treatment' that she received") (citation omitted).

Hesketh contends that the ALJ's conservative treatment finding is not supported by substantial evidence because the record indicates that he was prescribed Cymbalta and Gabapentin. (Pl.'s Opening Br. at 15.) In other words, Hesketh contends that the ALJ erred in suggesting that he merely treated his allegedly disabling pain by relying only on over-the-counter medications.

The record does indicate that Hesketh did more than simply treat his pain with over-the-counter medications. (*See* Tr. 280, prescribing Cymbalta to treat Hesketh's pain; *see also* Tr. 54, stating that Hesketh was taking Gabapentin at the time of the hearing; *but see* Tr. 35, noting that Gabapentin was previously discontinued because it purportedly was not effective). However, the

record also indicates that Hesketh: (1) was advised to modify his diet and engage in regular exercise (Tr. 281, recommending that Hesketh avoid refined foods and engage in "[r]egular exercise most days for [thirty] minutes or more, including cardiovascular, strength and flexibility training," (2) was, at times, not taking any prescribed pain medication, as the ALJ observed in his written opinion (Tr. 276, establishing care and noting on January 16, 2013, that Hesketh was "not taking prescribed medications," Tr. 301-04, noting on July 17, 2013, that Hesketh had "abruptly stopped taking Cymbalta" and that all of his medications, with the exception of nicotine patches, were discontinued), and (3) was advised to pursue physical therapy and a home exercise program post-knee surgery, but failed to do so (Tr. 318, noting on January 27, 2014, that Hesketh had not been attending physical therapy or doing his home exercise program "other than walking his dog").

Courts have concluded that diet, exercise, physical therapy, Gabapentin, and Cymbalta are conservative treatment measures. *See Martin v. Colvin*, No. 3:14-01603-SB, 2016 WL 890106, at *11 (D. Or. Feb. 9, 2016) (explaining that diet and exercise are conservative treatment); *Jackson v. Colvin*, No. 14-177, 2015 WL 1412314, at *6 (S.D. Ohio Mar. 23, 2015) (collecting cases and noting that Gabapentin is "considered to be a conservative treatment measure"); *Black v. Colvin*, No. 15-2148, 2016 WL 1268289, at *3 (W.D. Ark. Mar. 31, 2016) (noting that the claimant's treating physician "recommended conservative treatment, including adding Cymbalta to her existing medication and continuing her physical therapy efforts"); *Ingram v. Colvin*, No. 14-3036, 2015 WL 1268182, at *8 (D. Neb. Mar. 19, 2015) (upholding conservative treatment finding, and describing the claimant's treatment, which consisted of prescriptions for tramadol, Cymbalta, and methylphenidate, as "routine and conservative in nature"); *see also Hanes v. Colvin*, 651 F. App'x 703, 705-06 (9th Cir. 2016) (upholding ALJ's

conservative treatment finding where the claimant's plan "consisted primarily of minimal medication [i.e., narcotic pain killers, such as Opana, Fentanyl, and morphine], limited injections, physical therapy, and gentle exercise"). Accordingly, the ALJ's conservative treatment finding is supported by substantial evidence, even though the ALJ misstated that Hesketh relied *only* on over-the-counter medications. *See Fenton v. Colvin*, No. 6:14-00350-SI, 2015 WL 3464072, at *1 (D. Or. June 1, 2015) ("The Court is not permitted to affirm the Commissioner on a ground upon which the Commissioner did not rely, but the Court is permitted to consider additional support for a ground on which the ALJ relied.").

Second, the ALJ discounted Hesketh's symptom testimony based, in part, on conflicting medical evidence. *See Bowers*, 2012 WL 2401642, at *9 (noting that conflicting medical evidence is a clear and convincing reason for discounting a claimant's testimony). For example, the ALJ cited the results of previously-discussed examinations that showed "minimal objective findings" and Dr. Belzer's opinion that "there is no medical basis for the claimant's subjective need to elevate his legs." (Tr. 17-18; *see also* Tr. 42-44, confirming that Dr. Belzer did not believe that Hesketh needed to elevate his legs "to either preclude his worsening [pain] or to make it better"). In the preceding pages of his opinion, the ALJ described those "minimal objective findings," noting, among other things, that: (1) Hoskins ordered a number of autoimmune/inflammatory studies, and Hesketh's ANA, CCP, and lyme disease tests were normal and his peripheral neuropathy-related testing (i.e., vitamin B12, folate, homocysteine and ferritin) were at normal levels (Tr. 14, 284); and (2) on a number of occasions, Hesketh exhibited a normal gait and full range of motion and/or strength in his upper and lower extremities (Tr. 13-14, 269, 279-80, 315).

Hesketh argues that the ALJ's finding of conflicting medical evidence is not supported by substantial evidence because Dr. Kho opined that it was necessary for Hesketh to elevate his legs, and because Dr. Belzer's testimony establishes that he was "unaware of the lumbar spine MRI evidence Dr. Pritchard summarized at [page] 191" of the transcript, which revealed that Hesketh exhibited signs of "stenosis," a condition Hesketh claims "can cause back and leg pain [that] can be alleviated by leg elevation." (Pl.'s Opening Br. at 14-15) Hesketh also argues that conflicting medical evidence, "by itself," does not amount to substantial evidence. (Pl.'s Opening Br. at 14.)

Hesketh's arguments are not persuasive. In making an adverse credibility determination, it is appropriate for an ALJ to consider conflicting medical evidence or the lack of medical evidence corroborating the claimant's testimony. *See Nikitchuk v. Astrue*, 240 F. App'x 740, 742 (9th Cir. 2007) (holding that the ALJ "properly considered the lack of medical evidence corroborating [the claimant's] testimony as one factor in his credibility determination" and "the affirmative medical evidence in the record that contradicted [the claimant's] testimony"); *Martin*, 2016 WL 890106, at *9 ("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects.") (citation omitted). Contrary to Hesketh's arguments, the ALJ did not reject Hesketh's testimony *solely* because it conflicted with, or was not fully corroborated by, the objective medical evidence. Rather, as discussed, the ALJ also relied on Hesketh's conservative treatment measures in discounting his testimony. Further, it is immaterial whether Drs. Belzer and Kho agreed about whether leg elevation was a medical necessity, or whether Dr. Belzer was aware of a lumbar spine MRI, because the ALJ's opinion cites a number of benign testing and

examination results (some of which are cited above) that are in conflict with the degree of impairment alleged.[3] These benign results provided sufficient grounds for discounting Hesketh's symptom testimony based, in part, on conflicting medical evidence or the lack of corroborating medical evidence. *See Conner*, 2017 WL 24621, at *1 (upholding adverse credibility determination under clear and convincing reasons standard, and noting that the ALJ "permissibly considered" the claimant's "ordinary physical exam findings" as a basis for finding her less than fully credible).

Third, the ALJ discounted Hesketh's testimony on the ground that it did not comport with the record evidence. (*See* Tr. 17, observing that "the frequency and severity of the physical symptoms the claimant testified to . . . are not supported by the record"). An ALJ may reject subjective symptom testimony that does not comport with the record. *See Mitchell v. Colvin*, 584 F. App'x 309, 311 (9th Cir. 2014) (upholding adverse credibility determination under the clear and convincing reasons standard, and noting that the ALJ found that the claimant's testimony

---

[3] Dr. Belzer testified that he received Exhibits 1A through 8F (pages 72 through 316 of the transcript) prior to the administrative hearing, and presumably would have reviewed Dr. Pritchard's brief summarization on page 191 of Exhibit 4E. (Tr. 28.) Dr. Belzer was also told about the contents of Exhibit 9F (Dr. Bents and Swartz's records from Paragon Orthopedic Center) during the hearing. (Tr. 28-32.) However, Dr. Belzer stated that Hesketh's doctors "didn't really do . . . things like an MRI of his spine looking for damage to the core," which arguably conflicts with Dr. Pritchard's passing reference to a lumbar MRI showing some signs of stenosis. (*Compare* Tr. 42 *with* Tr. 191.) Hesketh claims that the "ALJ did not admit the referenced MRI report into evidence" (Pl.'s Reply Br. at 13), but the record suggests that Hesketh's counsel was presented with the opportunity to supplement the record and chose not to do so. (*See* Tr. 27, "ALJ: Are you aware of any medical [records outside of the now-admitted Exhibits 1A through 9F] still outstanding [that] you feel we should have in this case? ATTY: No, your honor"). Thus, Hesketh's complaint that the record was incomplete lacks merit. *See Conner v. Colvin*, ---- F. App'x ----, 2017 WL 24621, at *1 (9th Cir. Jan. 3, 2017) (holding that the claimant's argument that the record was incomplete lacked merit because she was provided with an "opportunity to supplement the record"). The Court also notes that Dr. Pritchard determined Hesketh could perform modified light exertion work, could perform his past relevant work, and was not disabled, despite apparently exhibiting signs of stenosis. (Tr. 79-82, 191.) It is clear, then, that at least one doctor assessed the impact stenosis would have on Hesketh's ability to work.

"did not comport with the record"). In particular, the ALJ took issue with Hesketh's testimony regarding his need to elevate his feet "eighty percent of the day." (Tr. 17, 56.) During the hearing held on February 13, 2014, Hesketh testified that he has been elevating his feet at this frequency for two to two-and-a-half years. (Tr. 56.) It was reasonable for the ALJ to infer that Hesketh's testimony did not comport with the record when considering: (1) Dr. Belzer's testimony that feet elevation was not a medical necessity, as the ALJ noted in his written opinion (Tr. 17-18), (2) up until November 2011, less than two-and-a-half years before the hearing, Hesketh was receiving unemployment benefits, and thus would have represented that he was able to work in at least some capacity, which is inconsistent with his reported need to elevate his feet eighty percent of the day and his reported inability to stand on his "feet long enough to [even] make meals" (Tr. 183), and (3) in September 2013, roughly two years post-onset date and Hesketh's exhaustion of his unemployment benefits, Hesketh reported that he was working as "wedding musician." (Tr. 344.) Thus, the Court finds that the ALJ did not err. *See Fenton*, 2015 WL 3464072, at *1 ("The Court is not permitted to affirm the Commissioner on a ground upon which the Commissioner did not rely, but the Court is permitted to consider additional support for a ground on which the ALJ relied.").

Based on the foregoing, the Court declines to second-guess the ALJ's credibility determination because it is reasonable and supported by substantial evidence. *See Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) ("[T]he ALJ's interpretation of [the claimant's] testimony may not be the only reasonable one. But it is still a reasonable interpretation and is supported by substantial evidence; thus, it is not our role to second-guess it."); *Dowell v. Berryhill*, No. 16-614-SI, 2017 WL 1217158, at *5 (D. Or. Apr. 3, 2017) (noting that an ALJ's

credibility determination may be upheld even if some of the reasons provided were not legally sufficient).

## II.     MEDICAL OPINION EVIDENCE

### A.     Applicable Law

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). In the event "a treating or examining physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and resolve the conflict.'" *Id.* (citation omitted). "An ALJ may only reject a treating physician's contradicted opinions by providing 'specific and legitimate reasons that are supported by substantial evidence.'" *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (quoting *Ryan v. Comm'r Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). Merely stating conclusions is insufficient: "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id.* at 1012-13 (citation omitted).

///

## B. Application of Law to Fact

Hesketh argues that the ALJ failed to provide legally sufficient reasons for discounting the opinions of Drs. Pritchard, Wiggins, Steinbrenner, and Kho. These opinions are addressed in turn.

### 1. Drs. Pritchard and Wiggins

Hesketh argues that the ALJ failed to account for Dr. Wiggins' opinion that Hesketh should be limited to occasional reaching, or Dr. Pritchard's purported opinion that Hesketh suffers from the severe medically determinable impairment of lumbar degenerative disc disease. (Pl.'s Opening Br. at 20.) Hesketh also argues that the ALJ erred by failing to "explain the weight" that was given to Drs. Pritchard and Wiggins' functional capacity assessments. (Pl.'s Opening Br. at 20.) Upon review, the Court concludes that the ALJ did not commit reversible error.

Contrary to Hesketh's argument, the ALJ's written opinion indicates that he assigned less than full weight to Drs. Pritchard and Wiggins' opinions. The ALJ assigned "significant weight" to the opinion of Dr. Belzer because he had "the entire file to review," unlike the state agency physicians. (Tr. 18.) Nothing more is required of an ALJ under Ninth Circuit case law to discount a doctor's opinion. *See McLeod v. Colvin*, No. 13-1802, 2014 WL 3335968, at *3 (W.D. Wash. July 7, 2014) (noting that "an ALJ is not required to 'recite the magic words I reject the doctor's opinion . . . because'" (brackets and ellipses omitted) (quoting *Magallanes v. Brown*, 881 F.2d 747, 755 (9th Cir. 1989)))

Furthermore, even if the ALJ failed to find that Hesketh suffers from the severe impairment of lumbar degenerative disc disease or needs to be limited to occasional reaching, any error was harmless. *See Molina*, 674 F.3d at 1111 (noting that a district court "may not reverse an ALJ's decision on account of an error that is harmless"). "An error by the ALJ may be

deemed harmless if it is clear that the ALJ would have reached the same result absent the error." *McLeod*, 2014 WL 3335968, at *2 (citing *Molina*, 674 F.3d at 1115). As Hesketh acknowledges, the ALJ's failure to account for his reaching limitation was harmless error because Hesketh testified that his past relevant work did not involve more than occasional reaching, and because Dr. Wiggins found that Hesketh could perform his past work despite his reaching limitation. (*See* Pl.'s Reply at 8, "The Commissioner correctly notes that [the failure to account for occasional reaching] is harmless error at step four because the past jobs . . . did not require more than occasional reaching").

The ALJ's alleged failure to find that Hesketh suffers from the severe impairment of lumbar degenerative disc disease was also harmless because step two was resolved in Hesketh's favor, *see Mondragon v. Astrue*, 364 F. App'x 346, 348 (9th Cir. 2010) ("Any alleged error at step two was harmless because step two was decided in [the claimant's] favor with regard to other ailments"), and because the ALJ would have reached the same conclusion at step four absent any error. (*See* Tr. 82, indicating that Dr. Pritchard was of the opinion that Hesketh could perform his past work despite his impairments and functional limitations).

For these reasons, the ALJ did not commit reversible error in evaluating the state agency physicians' opinions.

### 2. Dr. Steinbrenner

Hesketh next argues that the ALJ erroneously discounted Dr. Steinbrenner's opinion. The Court disagrees.

Dr. Steinbrenner's consultative examination report conflicts with, among other things, the assessments completed by the non-examining state agency doctors, none of whom opined that Hesketh is unable to sit, stand, or walk for more than twenty to thirty minutes due to pain in his lower extremities. (*Compare* Tr. 79-81, *and* Tr. 89-91, *with* Tr. 269.) Therefore, the ALJ needed

to provide specific and legitimate reasons for discounting Dr. Steinbrenner's consultative report. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) ("[I]n the case of a conflict 'the ALJ must give specific, legitimate reasons for disregarding the opinion of the treating physician.'"); *see also Kilian v. Barnhart*, 226 F. App'x 666, 668 (9th Cir. 2007) ("Kilian's contention that the ALJ erred when he discounted her treating physician's opinion is flawed because the treating physician's opinion conflicted with that of a nonexamining physician, and the ALJ supported his decision with specific and legitimate reasons."). The ALJ did so here.

First, the ALJ discounted Dr. Steinbrenner's opinion evidence on the ground that he "was not given the benefit of any medical record review." (Tr. 18.) This was a specific and legitimate reason for discounting Dr. Steinbrenner's opinion. *See Castaneda v. Astrue*, No. 11-267, 2012 WL 1391955, at *10 (E.D. Cal. Apr. 20, 2012) ("The ALJ offered several specific and legitimate reasons to reject the contradicted opinion of examining physician Venter, to wit: it is internally inconsistent, the doctor did not review any medical records, and the opinion relies on Plaintiff's subjective complaints. All are proper reasons to discount the physician's opinion."); *Armstrong v. Astrue*, No. 09-1063, 2010 WL 2745273, at *15-16 (D. Ariz. July 12, 2010) (upholding rejection of consultative examiner's opinion based, in part, on the fact that the examiner did not have the benefits of reviewing the entire record); *see also Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) (upholding rejection of medical provider's assessment, noting that the provider "did not review objective medical data or reports from treating physicians or counselors" and instead relied on the claimant's "complaints and information submitted by her family, her friends, and a former counselor"). Hesketh does not argue that it was erroneous for

the ALJ to reject Dr. Steinbrenner's opinion on this ground. (*See* Pl.'s Opening Br. at 21; Pl.'s Reply Br. at 9-11.)

Second, the ALJ discounted Dr. Steinbrenner's opinion evidence because it is inconsistent with his own examination findings. (*See* Tr. 18, discounting Dr. Steinbrenner's opinion because his "own examination findings would not support the sit, stand, and walk limitations he notes"). A conflict between a doctor's opinion and his own examination findings is a specific and legitimate reason to discount his opinion. *See Lawrence v. Colvin*, No. 15-cv-00098, 2016 WL 1445300, at *7 (D. Nev. Feb. 11, 2016) ("A conflict between a physician's opinion and his clinical findings is a specific and legitimate reason to discount the physician's opinion."). Hesketh contends that the ALJ's statement regarding Dr. Steinbrenner's findings "is unsupported layperson speculation." (Pl.'s Opening Br. at 21.) The Court disagrees. During the administrative hearing, the medical expert, Dr. Belzer, called Dr. Steinbrenner's opinion into doubt based on the results of his examination and others (i.e., examinations showing a normal gait, nearly intact reflexes, full strength in the upper and lower extremities, etc.), and concluded that Hesketh's peripheral neuropathy has not, in fact, impacted his "ability to stand and walk to any significant extent." (Tr. 33-34.) Dr. Belzer also testified that he agreed with Drs. Pritchard and Wiggins' findings that Hesketh can sit, stand, and walk for six hours in an eight-hour workday. (Tr. 39-40.) In light of the conflicting medical testimony described above, the Court rejects Hesketh's assertion that the ALJ committed reversible by engaging in "unsupported layperson speculation."

Third, the ALJ rejected Dr. Steinbrenner's opinion in favor of the conflicting opinion provided by Dr. Belzer. (*See* Tr. 18, assigning "significant weight" to Dr. Belzer's opinion evidence before assigning "light weight" to the consultative examination conducted by Dr.

Steinbrenner). Dr. Belzer's conflicting opinion regarding Hesketh's functional limitations, coupled with the other reasons described above, constitutes substantial evidence necessary to affirm the ALJ's rejection of Dr. Steinbrenner's opinion evidence. *See, e.g.*, *Morford v. Colvin*, No. 6:15-cv-01216-SB, 2016 WL 3092109, at *8 (D. Or. June 1, 2016) (stating that a non-examining doctor's opinion, coupled with other reasons provided by the ALJ, constituted "the substantial evidence necessary to affirm the ALJ's rejection" of another doctor's opinion evidence).

The ALJ also discounted Dr. Steinbrenner's opinion on the ground that it was based to a large extent on Hesketh's self-reports, which, as discussed above, the ALJ properly discounted as not entirely credible. An ALJ may reject a "physician's opinion if it is based to a large extent on a claimant's self-reports that have been properly discounted as incredible." *Burrell v. Colvin*, 775 F.3d 1133, 1140-41 (9th Cir. 2014) (citation and quotation marks omitted). Hesketh disputes whether Dr. Steinbrenner's opinion was based to a large extent on his self-reports. In support of his argument, Hesketh asserts that the ALJ engaged in "unfounded speculation" and "pointed to no evidence that Dr. Steinbrenner was basing his findings on Mr. Hesketh's self-report." (Pl.'s Opening Br. at 21.) From the Court's perspective, it was reasonable for the ALJ to conclude that Dr. Steinbrenner relied to a large extent on Hesketh's self-reports, given the limited duration of Dr. Steinbrenner's examination (forty minutes) and the fact that he was not provided with past medical records. (*See* Tr. 18, discounting Dr. Steinbrenner's opinion, noting the "very brief" encounter he had with Hesketh, and that he "was not given [the] benefit of any medical record review"). Also supporting the reasonableness of the inference drawn by the ALJ is the medical testimony suggesting that Dr. Steinbrenner's findings do not support the degree of limitation he assessed.

For these reasons, the Court concludes that the ALJ's rejection of Dr. Steinbrenner's opinion evidence was supported by substantial evidence and, therefore, should not be disturbed on appeal.

### 3.    Dr. Kho

Finally, Hesketh argues that the ALJ erred by failing to provide legally sufficient reasons for discounting Dr. Kho's medical source statement dated January 21, 2014. The Court disagrees.

Dr. Kho's medical source statement conflicts with, *inter alia*, the assessments completed by the non-examining state agency medical experts, none of whom opined that Hesketh can stand and walk for less than two hours in an eight-hour workday, and sit for about two hours. (*Compare* Tr. 79-81, *and* Tr. 89-91, *with* Tr. 311.) Therefore, the ALJ needed to provide specific and legitimate reasons for discounting Dr. Kho's opinion. *See Batson*, 359 F.3d at 1195 ("[I]n the case of a conflict 'the ALJ must give specific, legitimate reasons for disregarding the opinion of the treating physician.'"); *Kilian*, 226 F. App'x at 668 ("Kilian's contention that the ALJ erred when he discounted her treating physician's opinion is flawed because the treating physician's opinion conflicted with that of a nonexamining physician, and the ALJ supported his decision with specific and legitimate reasons."). The ALJ provided several specific and legitimate reasons here.

First, the ALJ discounted Dr. Kho's opinion on the ground that Dr. Kho "did not have the entire record to review." (Tr. 18.) Hesketh challenges the factual support for the ALJ's finding, noting that "not one physician upon whom the ALJ relied had the entire record to review." (Pl.'s Opening Br. at 22.) Hesketh also argues that his "lumbar spine MRI report is not even in the record." (*Id*.) In other words, Hesketh is implying that even Dr. Belzer, the medical expert who testified at the hearing after reviewing and/or discussing the record before the ALJ, did not have

the "entire record" because the lumbar spine MRI report was not included. As discussed above in footnote three, Hesketh's counsel was presented with the opportunity to supplement the record and declined to so. As a result, Hesketh's complaint that the record was incomplete lacks merit. *See Conner*, 2017 WL 24621, at *1 (holding that the claimant's argument that the record was incomplete lacked merit because she was provided with an "opportunity to supplement the record"). To the extent Hesketh argues that "not one physician upon whom the ALJ relied had the entire record to review," his contention also lacks merit because Dr. Belzer had the benefit of reviewing all of the records that Hesketh presented to the ALJ.

Second, the ALJ discounted Dr. Kho's opinion because it is inconsistent with his own examination findings. (Tr. 18, noting that Dr. Kho's "findings . . . do not support his identified limitations"). Such a conflict is a specific and legitimate reason to discount a doctor's opinion. *See Lawrence*, 2016 WL 1445300, at *7 ("A conflict between a physician's opinion and his clinical findings is a specific and legitimate reason to discount the physician's opinion."). Hesketh does not challenge the ALJ's rejection of Dr. Kho's opinion on this ground. (*See* Pl.'s Opening Br. at 22-24; *see also* Pl.'s Reply at 11, relying on arguments presented in the opening brief). The ALJ's finding is support by substantial evidence, including, but not limited to, Dr. Belzer's testimony. (*See* Tr. 44-46, discussing findings that were inconsistent with Dr. Kho's opinions).

Third, the ALJ discounted Dr. Kho's opinion in favor of the conflicting opinion provided by Dr. Belzer. (*See* Tr. 18, assigning "significant weight" to Dr. Belzer's opinion evidence before assigning "no weight" to Dr. Kho's medical source statement). Dr. Belzer's conflicting opinion regarding Hesketh's functional limitations, coupled with the other reasons described above, constitutes substantial evidence necessary to affirm the ALJ's rejection of Dr. Kho's

medical source statement. *See, e.g.*, *Morford*, 2016 WL 3092109, at *8 (stating that a non-examining doctor's opinion, coupled with other reasons provided by the ALJ, constituted "the substantial evidence necessary to affirm the ALJ's rejection" of another doctor's opinion evidence).

Fourth, the ALJ discounted Dr. Kho's opinion because he only "provided one treatment record," and because "he has followed the claimant since 1986 but there is a lack of treatment records supporting this." (Tr. 18.) Substantial evidence supports the ALJ's findings. The record reveals the following:

- Dr. Kho testified that he has treated Hesketh "monthly/semiannually since 1986" (Tr. 310);

- In December 1998, over a decade before Hesketh stopped working, Dr. Kho referred Hesketh to Oregon Health and Sciences University ("OHSU") for a second opinion regarding "possible peripheral neuropathy" (Tr. 208);

- During his examination at OHSU, Hesketh did "not note that the symptoms in his lower extremities are significantly altered by any of his activities, positions, or particularly worse at night," and the treating neurologist, Dr. Kimberly Goslin ("Dr. Goslin"), ordered follow-up tests (including a lyme test, which Hoskins found was negative in January 2013, Tr. 284), and noted "additional evaluation may be necessary" based on the test results and that Hesketh's "examination was remarkable only for mild skin color changes in the toes, decreased sensation in the big toes, and slight decrease in strength in toe flexion as well," which Dr. Goslin stated was "a complex and unusual constellation of symptoms not typical of a common type of neuropathy" (Tr. 210);

- In his only treatment note on record, Dr. Kho stated that Hesketh was referred to OHSU but was "unable to follow up with them" (Tr. 314);

- On July 2, 2012, roughly three years after Hesketh stopped working due primarily to idiopathic peripheral neuropathy and close to one year after the alleged onset of disability, the Oregon Department of Human Services ("DHS") requested that Dr. Kho provide Hesketh's medical records for the period covering September 1, 2008, "to present" (Tr. 218-19);

- On July 3, 2012, DHS learned that there were "[n]o medical records on file for this patient" and noted that Dr. Kho could be contacted if there were "any questions" (Tr. 218; *see also* Ct. Tr. Index at 2, "No Medical Records, dated 07/02/2012, from Yung K. Kho, M.D.");

- On March 27, 2013, Dr. Kho apparently came out of retirement and "reopened his office for a short while" before retiring again (*See* Tr. 45, "ATTY: . . . This visit on March 27, 2013 was a visit after Dr. Kho reopened his office for a short while. Dr. Kho retired, but then came back into practice, but then retired again. In any event, years prior to this entry of March 27, 2013, the claimant was being treated by Dr. Kho"); and

- On January 21, 2014, Dr. Kho completed a check-box questionnaire, opining that Hesketh suffers from severe functional limitations due largely to idiopathic peripheral neuropathy (Tr. 310-13).

Hesketh asserts that the ALJ erred in discounting Dr. Kho's opinion based on the nature of the treating relationship described and the lack of medical records from Dr. Kho (in particular, a lack of contemporaneous clinical evidence or records covering the period between September

2008 and March 2013). Hesketh maintains that the "ALJ had a duty to either subpoena Dr. Kho's records or obtain a rheumatological examination." (Pl.'s Opening Br. at 22.) The Court disagrees. The record makes clear that efforts were made to obtain treatment records from Dr. Kho that covered the relevant period, but DHS was told there were no records. The record also reveals that medical examiners opined that Hesketh could perform his past work despite his impairments, autoimmune/inflammatory studies were negative or "at normal levels," and Dr. Steinbrenner found "[n]o evidence for rheumatoid arthritis on physical exam." (Tr. 269, 284.) Thus, the record was neither ambiguous nor insufficient to evaluate the severity of a rheumatoid arthritis diagnosis.

Accordingly, the Court rejects Hesketh's argument that the ALJ had a duty to subpoena Dr. Kho's treatment records or obtain a rheumatological examination. *See Gilliam v. Berryhill*, No. 6:15–cv–02388–SB, 2017 WL 1364618, at *9 (D. Or. Mar. 29, 2017) (explaining that an ALJ need not order a consultative examination where the medical opinions and findings of record are neither "ambiguous or otherwise insufficient to render a disability decision") (citation omitted); *Melloni v. Massanari*, 98 F. App'x 65, 66 (9th Cir. 2004) (upholding rejection of treating physician's opinion based on, among other things, "the length, nature, and extent of the treating relationship" and "the lack of contemporaneous clinical evidence"); *see also Lee v. Colvin*, No. 6:13–cv–00809–SB, 2015 WL 3770707, at *12 (D. Or. Apr. 20, 2015) (concluding that the ALJ provided specific and legitimate reasons for discounting a treating doctor's opinion evidence, and noting that it was reasonable for an ALJ to take into consideration the fact that the treating doctor "made sweeping and unsupported conclusions" based largely on a single office visit).

In sum, the Court concludes that the ALJ did not err in discounting Dr. Kho's opinion because the ALJ provided several specific and legitimate reasons that were supported by substantial evidence.

## III.     MENTAL IMPAIRMENTS

Hesketh next contends that the Court should reverse and remand this case because the ALJ failed to apply the psychiatric review technique ("PRT") in assessing Hesketh's mental impairments.

It is well settled that 20 C.F.R. § 404.1520a "requires those reviewing an application for disability to follow a special [PRT]," which consist of reviewing whether the applicant has a medically determinable mental impairment, rating the degree of limitation in four functional areas, assessing the severity of the mental impairment, and, if the impairment is severe, proceeding to step three of the sequential process to determine whether the impairment meets or equals a mental listing. *Keyser*, 648 F.3d at 725. However, an ALJ is not required to utilize the PRT unless the claimant presents a colorable claim of mental impairment. *See Alekseyevets v. Colvin*, 524 F. App'x 341, 343 (9th Cir. 2013) ("The ALJ's determination that Appellant failed to present a colorable claim of mental impairment was supported by substantial evidence in the record, and thus utilization of the PRT was not required."). In the Ninth Circuit, an ALJ's failure to utilize the PRT is subject to harmless error review. *See, e.g.*, *Spence v. Colvin*, 617 F. App'x 752, 754 (9th Cir. 2015) ("Spence asserts that the ALJ erred by not addressing the limitation factors under 20 C.F.R. § 404.1520a. To the extent that the ALJ erred in not addressing the factors, it was harmless, because Spence has not 'demonstrated a colorable claim of mental impairment.'") (citation omitted).

The parties dispute whether Hesketh has demonstrated a colorable claim of mental impairment. Before reaching the merits of that dispute, it should be noted that Hesketh did not

allege before the ALJ that any mental impairment has impacted his ability to work. (*See* Tr. 59, "Is there anything else that you feel is important that we haven't mentioned [today at the hearing] that you would like to mention to the [ALJ] that relates to your ability to function in [a] work setting since November of 2011? A. Well, I would like to just emphasize the necessity and the need to keep my feet elevated. . . . It is absolutely necessary for me to keep my feet elevated the majority of . . . every day," Tr. 73, "You say [in your application that] you are disabled because of rheumatoid arthritis, peripheral neuropathy, high blood pressure, back injury, knee injury, and right shoulder injury," Pl.'s Reply Br. at 2-3, noting that Hesketh is "not arguing that his mental impairment 'prevented him from working,'" nor has he explicitly stated that any mental impairment caused him to suffer from self-reported limitations in his concentration and ability to complete tasks). That fact detracts from Hesketh's argument. *See Spence*, 617 F. App'x at 754 (holding that the "ALJ's duty to develop the record regarding a mental impairment was not triggered" based, in part, on the fact that the claimant "did not claim a mental impairment before the ALJ").

With that context in mind, the Court turns now to the evidence Hesketh cites in support of his claim that he has demonstrated a colorable claim of mental impairment. That evidence consists of: (1) a medication list completed by Hesketh indicating that Hoskins prescribed medication for PTSD (Tr. 204); (2) treatment notes dated November 14, 2008 and April 2, 2009, indicating that Dr. Mark Rondeau ("Dr. Rondeau") assessed "[s]tress and depression" and Hesketh later expressed a desire to adjust his depression medication (Tr. 213, 217); (3) treatment notes from Hoskins indicating that Hesketh exhibited "positive symptoms" of PTSD and "moderately severe depression" (Tr. 289-90); and (4) Dr. Kho's opinion that Hesketh suffers

from PTSD and anxiety, and therefore is incapable of handling even low stress work (Tr. 313).

(*See* Pl.'s Reply Br. at 3-4.)

Like *Spence*, Hesketh has not demonstrated a colorable claim of mental impairment here. Dr. Rondeau's medical records, which predate the alleged onset of disability by several years, make clear that Dr. Rondeau was relying on Hesketh's self-reports in assessing stress and depression. (*See* Tr. 216-17, noting that Hesketh "report[e]d issue[s] with stress and depression," that he recently "separated from his wife," and that he was "feeling quite a bit of pressure in terms of a quota for production" at work," and then assessing "[s]tress and depression" and cautioning Hesketh about his use of alcohol because it "is a depressant" that would only provide a "short term benefit"). As discussed above, Hesketh's self-reports were properly discounted as not entirely credible. In any event, Dr. Rondeau's assessment predates the alleged disability period.

Dr. Kho's opinions also fail to support the conclusion that Hesketh has demonstrated a colorable claim of mental impairment. The ALJ provided specific and legitimate reasons for discounting Dr. Kho's opinion evidence. *See generally Burke v. Comm'r of Soc. Sec.*, No. 13–1890, 2015 WL 769951, at *5 (D. Or. Feb. 23, 2015) ("An ALJ's RFC need only incorporate credible limitations supported by substantial evidence in the record and [it] must be consistent with the restrictions identified in the medical testimony."). Furthermore, Dr. Kho's records offer no findings or examination results that would support a colorable claim of mental impairment. (*See* Tr. 310-16.)

Hesketh's reliance on Hoskins' findings and records is no more persuasive. Hoskins discontinued Hesketh's medication for PTSD, around the time Hesketh reported that he was dealing with family and legal-related stressors and wished to seek alternative treatment. (Tr.

301.) Additionally, in concluding that Hesketh exhibited "positive symptoms" of PTSD and "moderately severe depression," Hoskins relied largely on the Patient Health Questionnaire-9 ("PHQ-9") and PTSD Checklist, Civilian Version ("PCL-C"). (*See* Tr. 282-83, noting that Hesketh was administered the PHQ-9 and PCL-C, and he scored consistent with "moderate depression" and "positive symptoms of PTSD"). These tests are dependent on the patient's own-self reports. *See Camillo v. Comm'r Soc. Sec. Admin.*, No. 11–1345, 2013 WL 5692435, at *25 n.19 (S.D.N.Y. Oct. 2, 2013) (noting that the PHQ–9 is a "self-administered" depression module); *Stroman v. Colvin*, No. 14-03022, 2016 WL 5171534, at *8 n.28 (S.D. Tex. Feb. 17, 2016) (explaining that the PCL-C is a "self-report rating test" for PTSD that is "self-administered"). Given the dependence of these tests on Hesketh's own self-reports, which the ALJ provided legally sufficient reasons for discounting, Hesketh has failed to demonstrate that the ALJ committed harmful error by not addressing Hoskins' mental health findings. *See McLeod*, 2014 WL 3335968, at *2 ("An error by the ALJ may be deemed harmless if it is clear that the ALJ would have reached the same result absent the error.").[4]

In sum, to the extent that the ALJ erred in not applying the PRT, the Court concludes that it was a harmless error, because Hesketh has not demonstrated a colorable claim of mental impairment, and because it is clear that the ALJ would have reached the same result absent any error. *See Spence*, 617 F. App'x at 753-54 (reaching a similar conclusion where, as here, there was "no objective medical evidence to support [the claimant's] suggestions of mental

---

[4] Also supporting the conclusion that the ALJ did not commit harmful error is the fact that Hoskins is not an acceptable medical source, because nothing in the record indicates that she worked under or with any physician at Karen Hoskins PC. *See Britton*, 787 F.3d at 1013 (noting that a "nurse practitioner could be considered a medically acceptable source where he worked so closely under a physician that he was acting as the physician's agent"); *Farrell v. Astrue*, No. 5:10–CV–284, 2011 WL 6941390, at *7 (D. Vt. Nov. 23, 2011) (noting that an ALJ is not necessarily required to accept evidence from an "other source" (citing, *inter alia*, *Bunnell v. Sullivan*, 912 F.2d 1149, 1152 (9th Cir. 1990))).

limitations" and the claimant "did not assert before the agency that he was disabled based on a mental impairment"); *see also Burke*, 2015 WL 769951, at *5 (noting that a claimant's RFC determination need only incorporate "credible limitations supported by substantial evidence in the record").

## IV.    STEP FOUR—PAST RELEVANT WORK

Finally, Hesketh argues that the ALJ's step four finding (past relevant work) was erroneous and not supported by substantial evidence. The Court is not persuaded by Hesketh's argument.

"At step four, a claimant has the burden to prove that he cannot perform his past relevant work 'either as actually performed or as generally performed in the national economy.'" *Stacy v. Colvin*, 825 F.3d 563, 569 (9th Cir. 2016) (citation omitted). "ALJs may use either the 'actually performed test' or the 'generally performed test' when evaluating a claimant's ability to perform past work." *Id.* Social security rulings explain how to apply the "actually performed test": "Under this test, where the evidence shows that a claimant retains the RFC to perform the functional demands and job duties of a particular past relevant job as he or she actually performed it, the claimant should be found to be 'not disabled.'" SSR 82-61, 1982 WL 31387, at *2 (1982).

Hesketh completed a work history report regarding the three positions he worked during the past fifteen years: (1) "Tech Account Executive" in the telecommunications industry from February 2007 to October 2009 (hereinafter, "Position One"); (2) "Technician Account Executive" in the telecommunications industry from January 1999 to February 2007 (hereinafter, "Position Two"); and (3) "Technician Account Executive" in the telecommunications industry from January 1988 to April 1995 (hereinafter, "Position Three"). (Tr. 167.) In the work history

report, Hesketh testified that Positions One and Two involved lifting no more than twenty

pounds, and Position Three involving lifting up to fifty pounds. (Tr. 169-71.)

During the hearing, Hesketh was questioned about the lifting demands of his past work:

> Q.    Did you have difficulty carrying the items that you were
> displaying for customers?
>
> A.    Correct. Many times it'd be in big shipping containers to
> show the electrical portion in some telephones, and . . . I'd
> have to probably carry five or six, try to carry five or six
> boxes.
>
> Q.    Which would weigh up to how much in the way of pounds?
>
> A.    Some of them had to be [forty] pounds, maybe.
>
> Q.    All right. Okay.
>
> A.    I'm not sure --
>
> . . . .
>
> [Q]:   And that was when you worked [in Position Three] from
> 1988 to 1995, that job you put down you had to lift [fifty]
> pounds or more.
>
> [A]:   Correct.
>
> [Q]:   [And] you put down you didn't have to lift more than
> [twenty] pounds in [Positions One and Two]. And that was
> from 1999 to October of 2009.
>
> [A]:   Yeah. Yeah, . . . some of the boxes were big, you
> know, over the years of me doing this. As far as
> [my more recent employment, though], all electronics are
> getting smaller, so my demo kit -- I don't know. My
> primary demo kit instead of some of the other systems were
> probably [ten] pounds, [twenty] pounds, I'm not sure[.]

(Tr. 51-52.)

Relying on Hesketh's testimony and in accordance with 20 C.F.R. § 404.1520(f),[5] the

ALJ's written decision compares Hesketh's RFC determination to the physical demands of his

past relevant work:

> [T]he claimant has past relevant work as a telecommunications technical account executive. According to the State agency consultants, the claimant's past work . . . is classified as . . . light work [i.e., lifting no more than twenty pounds]. In comparing the claimant's [RFC] with the physical . . . demands of this work as the claimant describes this work [in the work history report], the undersigned finds that the claimant is able to perform it as actually performed.

(Tr. 18) (internal citation omitted).

Hesketh contends that the ALJ's step four finding is erroneous because he clarified

during the hearing that his past work involved lifting up to forty pounds, yet the ALJ's RFC

determination limits Hesketh to light exertion work involving lifting no more than twenty. (Pl.'s

Opening Br. at 13.) The Commissioner counters that there is nothing in the record that indicates

that Hesketh could not return to Positions One and Two, the two most recent positions Hesketh

worked from January 1999 to October 2009, as actually performed. (Def.'s Br. at 11.) In his

reply, Hesketh argues, among other things, that his "description of the exertional demands of his

past relevant work is, at best, confusing and inadequate. At a minimum, therefore, the Court

should remand this matter to have the ALJ fully and fairly develop the record." (Pl.'s Reply Br.

at 6.)

Further development of the record is not necessary because the record was neither

ambiguous nor otherwise insufficient to assess whether Hesketh was able to perform his past

---

[5] Section 404.1520(f) provides: "Your impairment(s) must prevent you from doing your past relevant work. If we cannot make a determination or decision at the first three steps of the sequential evaluation process, we will compare our [RFC] . . . with the physical . . . demands of your past relevant work. If you can still do this kind of work, we will find that you are not disabled." 20 C.F.R. § 404.1520(f) (internal citation omitted).

relevant work. *See Gilliam*, 2017 WL 1364618, at *9 (explaining that an ALJ need not develop the record unless it "ambiguous or otherwise insufficient to render a disability decision"). Contrary to Hesketh's suggestion, his testimony was not confusing or inadequate. His testimony clearly indicates that his past relevant work involved lifting up to forty to fifty pounds until 1999. Thereafter, the electronics used in the position were "getting smaller," which is why Hesketh's primary demo kit later weighed between ten and twenty pounds. (Tr. 51-52.)

In sum, the ALJ's finding that Hesketh could perform his past work was supported by substantial evidence. Hesketh failed to meet his burden at step four, and he has failed to point to any credible evidence that would lead the Court to conclude that the ALJ should have further developed the record.

## CONCLUSION

For the reasons stated, the Court affirms the Commissioner's decision because it is free of legal error and supported by substantial evidence.

IT IS SO ORDERED.

DATED this  23rd  day of May, 2017.

_____
STACIE F. BECKERMAN
United States Magistrate Judge